**FILED**
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS

Aug 17, 2017

OFFICE OF THE CLERK

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE  DIVISION

BRENNAN BADLEY                                                                    PLAINTIFF

v.                                      Case No:  17-3068 TLB

CARROLL COUNTY, ARKANSAS,                                              DEFENDANTS
ROBERT GRUDEK, individually,
DONALD E. HARLAN Jr., individually;
TROY WENZEL, individually; and JOHN DOES 1-25,
Individually

COMPLAINT

Come now the Plaintiff, Brennan Badley (Badley), by and through his attorney, the

Morris W. Thompson Law Firm, P.A., and states and alleges as follows:

INTRODUCTION

1.      This is an action brought under 42 U.S.C. § 1983 and other. Badley seeks redress

against Robert Grudek (Grudek), Donald E. Harlan, Jr. (Harlan), Troy Wenzel (Wenzel), and

various  unknown John Does for their acts of commission and omission which were excessive in

violation of his rights protected by the U.S. Constitution as well as federal laws. Furthermore, he

seeks redress against Carroll County Arkansas ("Carroll County" or "the County") for its

policies, procedures, customs, and usages which were a proximate cause of his injuries and

losses.

2.      Additionally, pursuant to its plenary power under 28 U.S.C. § 1367, Badley seeks

relief under Ark. Const. Art. 2 § 2. 2 § 6, 2 § 9, 2 §*15* redressable under the Arkansas Civil

Rights Act of 1993 (ACRA*)*, codified at A.C.A. § 16-123-101 et seq.

1

<u>JURISDICTION AND VENUE</u>

3.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. Section 1343(a)(3), the jurisdictional provision of 42 U.S.C. § 1983; original jurisdiction pursuant to 28 U.S.C. § 1331, federal question jurisdiction. Additionally, pursuant to 28 U.S.C. § 1367, this court has supplemental jurisdiction to hear and decide the pendant state claims under the Arkansas Constitution and laws redressable under ACRA.

4.     All acts complained of occurred within the corporate limits of Carroll County, Arkansas.  Upon information and belief, at all relevant times, all parties were residents of Carroll County. Consequently venue is proper in this court pursuant to 28 U.S.C. § 1391(b).

<u>PARTIES</u>

5.     Badley is, and was at all relevant times, a resident of Carroll County.

6.     Harlan was, at all relevant times, a canine (K-9) deputy with the Carroll County Sheriff's Office assigned to the Patrol Division. All actions described of Harlan and complained of herein were in the capacity of a deputy of the Carroll County Sheriff's Department and under color of that authority.

7.     Wenzel was, at all relevant times, a patrol deputy with the Carroll County Sheriff's Office assigned to the Patrol Division. All actions described of Wenzel and complained of herein were in the capacity of a deputy of the Carroll County Sheriff's Department and under color of that authority.

8.     Grudek was the legally constituted Sheriff of Carroll County and functioned in that capacity at all times relevant hereto. Furthermore, as Sheriff of the County, Grudek was, at

all relevant times in question, the final decision and policy maker for the County in all law enforcement matters involving the Sheriff's office and its employees and agents. All actions described of Grudek and complained of herein were in the capacity of Sheriff of the Carroll County and under color of that authority.

9. Upon information and belief, John Does 1–25 were, at all relevant times, employed as Carroll County Sheriff's deputies. The true names and capacities of said defendants sued herein as Does 1-25 are unknown to Plaintiff. Plaintiff will amend his Complaint to show their true names and capacities when the same are ascertained. Said designation represents any and all staff, employees, and agents of the Sheriff's Department, presently unknown, who had any involvement in the actions or inactions proximately causing violations of Badley's

10. Carroll County is a local governmental subdivision of the State of Arkansas and as such is a person under 42 U.S.C. § 1983, the Arkansas Constitution and is amenable to suit thereunder.

## FACTS

11. In the afternoon of September 20, 2014, after a heated argument with his uncle, Badley returned to the apartment where he was staying, then decided to go for a walk to cool off and calm down.

12. When he attempted to leave out the front door, he saw two Green Forrest Police officers along with two Carroll County Sheriff's deputies, one of which with a canine walking up the sidewalk toward his door.

13. CCSO deputy Harlan was leading the approach with his canine, Tyson, an 8 year

3

old Belgium Malinois that had been fitted with a titanium cap or crown on one of his incisors.

14.    Rather than confront them or be confronted by him, he decided to leave out the back door. Once outside, he began to run as he had taken a hand gun and holster from the apartment with the intent of disposing of them. He was afraid things would escalate if the officers confronted someone who they thought was armed.

15.    After losing sight of the officers, he hid the hand gun and walked back to where he last saw the officers to surrender.

16.    Harlan was wearing a body cam that recorded video and audio once activated. The body cam, attached hereto as Plaintiff's exhibit A, recorded what happened as Badley surrendered to them.

17.    As Badley walked toward the officers he clasped his hands behind his head with the holster dangling empty from the crook of his arm, demonstrating that he was surrendering to their authority and showing that he was not a threat to them or anyone else.

18.    Badley complied immediately when a Green Forrest police officer ordered Badley to throw the holster away, face away, and drop to his knees.

19.    The Green Forrest officer then approached and pushed Badley onto the pavement into a prone position. He then took hold of Badley's hands holding them in front of Badley as he lay on the ground.

20.    The canine, Tyson, was in a heightened state of excitement and agitation. He constantly barked at Badley as he lay on the ground, and lunging against his lead out of control.

21.    While Badley lay prone on the pavement, Wenzel assisted the Green Forrest

4

police officer by searching Badley's pockets. While the two officers stood over Badley, Tyson, still excited, continued to bark loudly, leaping against his lead without Harlan attempting to calm him down.

22.    Harlan took another position to Badley's left, closer, where Badley could see Tyson barking loudly, snarling, leaping, and lunging at him.

23.    As a Green Forrest officer positioned Badley to be handcuffed behind his back, Tyson became more agitated lunging against his lead, barking and trying to get at Badley.

24.    Instead of quieting Tyson and calming him down,  Harlan let Tyson continue to threaten Badley. Harlan then yelled to the Green Forrest officers,  "He had something", and saying to Badley, "where's it at?" When Badley did not respond, Harlan  allowed Tyson to continue his aggressive and threatening behavior at Badley.

25.    Harlan intended to force Badley to comply with his demand by using Tyson to intimidate and scare Badley into answering his questions.  Harlan positioned themselves so Badley could see the canine lunging, barking, and snarling, Harlan intended to intimidate Badley into providing the information.

26.    Badley did not resist, attempt to flee custody, nor did or say anything threatening to the officers or anyone else. As Badley was not armed, already in custody, lying prone on the ground with his hands handcuffed behind his back, no law enforcement officer, under these circumstances, would reasonably believe Badley was a threat to the safety of the officers or the public.

27.    Furthermore, as Badley did not refuse any order given him by the officers, resist

5

the officers' authority, resist being handcuffed and placed into custody, no law enforcement officer could reasonably believe that any force was needed beyond that to handcuff Badley, search him, and bring him to his feet.

28.     Harlan did not give Badley a warning not to move about as any movement, although on the ground, would agitate the dog and trigger Tyson's attack.

29.     Neither Harlan, Wenzel, or any of the other officers at the scene had reasonable suspicion or probable cause to believe that Badley had committed a serious or violent crime, or that he was about to flee.

30.     Harlan did not give Badley a warning that he was going to release Tyson.

31.     Harlan improperly encouraged the dog's aggression by allowing it to remain in a heightened aggressive state.  After several lunges, Tyson charged Badley. Harlan called to Tyson but Tyson did not stop and return as a properly trained service canine is trained to do.

32.     Tyson attacked Badley, biting him on his left thigh. Badley screamed in pain, begging Harlan to get the dog off him. Badley was not resisting, not fighting, nor threatening anyone, but rather laying on ground writhing in pain, moving his legs in reaction to the dog's bite.

33.     Harlan yanked Tyson's lead calling Tyson's name repeatedly, giving the command to release. Tyson, did not release but continued to maul Badley, repositioning its bite on Badley's thigh. All the while Badley was screaming in pain begging Harlan to get the dog off of him. Not able to control the canine, Harlan yelled at Badley "Stop  f***ing moving".

34.     Badley tried to lay still, but despite his compliance, Tyson continued to bite,

6

chew, and maul Badley's thigh for an inordinately excessive amount of time. Crying out in pain

Badley pleaded with Harlan that he couldn't be still for much longer, pleading for Harlan to get

the dog off him.

35.     For over 90 seconds, a minute and thirty seconds, despite Harlan's repeated

commands to release, the canine continued to maul Badley, yanking, and driving its teeth further

into Badley's leg inflicting the deep wounds in his thigh as depicted in figure 1 below.



Figure 1

36.     Harlan's failure or inability to control the canine prolonged the unjustified attack.

7

37.    Finally, Harlan took Tyson off Badley. However, he blamed Badley for prolonging the attack, stating "When I say don't move, don't move. … When we have a canine sitting there, don't f***ing move, until you're told to."

38.    Harlan did not administer first aid to Badley immediately at the scene. Rather the Green Forrest police officers transported Badley to the Mercy Hospital ER in Berryville, Arkansas where he was treated for his injuries.

39.    The ER doctors at Mercy Hospital cleaned the laceration to his forehead and cleaned and stitched the wounds on his thigh. The doctors prescribed Badley an antibiotic ointment and Cephalexin 500 mg tablets. He was discharged with instructions to return to have the wounds inspected and to have the stitches removed.

40.    Badley was not arrested for the incident, but was arrested on an outstanding warrant.

41.    The torment of the attack did not stop after the dog's jaws released him. For quite some time Badley's leg was swollen and painful. He walked with a painful limp for a period of time.

42.    Badley has a phobia of dogs now whereas he did not have one previously. When he  hears a dog bark, he relives the frightening, painful incident all over again and has panic attacks.

43.    Additionally, he can no longer be comfortable around dogs of any size or breed. If one is around him, he becomes, nervous, and agitated.

44.    He can no longer visit friends he knows to have dogs as pets. If by chance he is in

a home that has a dog, he becomes hyper vigilant constantly trying to keep the animal in sight.

He becomes anxious to leave as soon as possible.

FEDERAL CIVIL RIGHTS VIOLATIONS UNDER 42 USC § 1983

45.     Badley adopts by reference the allegations contained in paragraphs 5 through 44 above.

I.     4th AMENDMENT EXCESSIVE FORCE

46.     As Badley lay flat on the ground, cooperating with the arresting officers, the attack by Tyson was unreasonable and excessive. At no point did Badley make a threatening move or motion at the officers.

47.     Under the circumstances presented, it was not objectively reasonable for Harlan to believe that the level of force exerted in engaging Tyson to attack Badley was warranted. As Badley was prone on the ground, handcuffed, and in custody, the force applied was not reasonably related to officer safety or safety of the public.

48.     Badley's right to be free of excessive force, and his right to bodily integrity were clearly established at the time and thus Harlan should have known to respect and safe guard those rights.

49.     Harlan is not entitled to qualified immunity for his actions in that the contours of the Badley's rights were of long standing and well known.

II.   14TH AMENDMENT DUE PROCESS CLAIM

50.     Badley adopts by reference the allegations contained in paragraphs 5 through 44 above.

9

51.     Badley's liberty interest in his bodily integrity and right not to have it violated by arbitrary government action is protected by the due process clause of the 14th Amendment; and was clearly and well established for more than two decades prior to the complained of incident.

52.     Harlan's purposeful, knowing, and deliberate use of the snarling canine to intimidate, and terrorize Badley was arbitrary and unrelated to any legitimate governmental interest.

53.     Harlan's use of the canine to attack and inflict pain on a helpless, non-threatening suspect laying handcuffed and prone on his stomach with two large police officers over him shocks the conscious and is not to be tolerated in a civilized society.

54.     As a result of the foregoing Harlan is not entitled to qualified immunity.

CONSPIRACY TO VIOLATE BADLEY'S RIGHTS

55.     Following the arrest, Wenzel and Harlan got together to write their reports in such a way to justify Harlan's actions and the use of force by the canine, Tyson, knowing that their written versions were false and did not comport with what actually happened.

56.     Their acts, omissions, were in consort/conspiracy and interfered with or attempted to interfere with and violate Badley's clearly established rights to be free of excessive and unreasonable force, and the right to enjoy and defend life and liberty.

57.     As a result of the foregoing, neither Harlan nor Wenzel are entitled to qualified immunity for their actions or inactions.

CARROLL COUNTY -  UNCONSTITUTIONAL POLICIES:

58.     Badley adopts by reference the allegations contained in paragraphs 5 through 43

10

above.

59.     Grudek was, at all relevant times, the final policy and decision maker for the County with respect law enforcement and specifically with regard to the training of handlers and service dogs.

60.     Grudek was assisted in these duties and responsibilities by John Does 1 – 25 who were delegated with authority to set policy, procedure, and practices for the canine officers and canines in their charge. The following acts of commission and omission attributable to the John Does is pursuant the authority given them by Grudek and ratified by Grudek. Any and all decisions made by the John Does establishing policy and practices of the Carroll County Sheriff's Office had the effect of law.

61.     Grudek  was not only responsible for the purchase of qualified trained canines, but once purchased, he was responsible for their ongoing training and supervision of their day-to-day usage.

62.     Grudek was responsible for the qualifications and supervision of the handlers.

63.      Harlan, and the K-9 officer before him, were not trained and certified K-9 handlers. Harlan was thus unqualified to work in this law enforcement capacity.

64.     Grudek's decision established policy for the County of assigning and retaining untrained and uncertified deputies as service dog handlers. This policy led directly to the constitutional and physical injuries Badley suffered.

65.     Grudek was aware that Harlan, and the canine handler before him, were routinely involved in civilian contact and suspect apprehension as part of their assigned duties as patrol

11

officers.

66.     In light of frequent patrol encounters and involvement in suspect apprehension with the potential for use of force, the need for specific training, particularly obedience training, was obvious to Grudek.

67.     Grudek was aware that law enforcement canines have the potential for aggressiveness; and therefore the use of service dogs required "adherence to procedures that properly controlled their use of force potential and that channel(ed) their specialized capabilities into legally acceptable crime prevention and control activities."

68.      Grudek was aware of the need to utilize only those canines that have been examined by a licensed veterinarian authorized to conduct examinations and certify the physical and emotional (temperamental) condition of the canine that is to utilized in public service as a service dog.

69.      Grudek was aware that because of the canine's potentiality for aggression and ability to effect severe injury by its bite:

> a. there needed to be an ongoing frequent training program for the K-9 officer and canine in order to insure the service dog's responsiveness to its handler;
>
> b. the police dog should release its hold on the suspect on a spoken command from its handler;
>
> c. that before a dog or handler can be placed on an "operational status" certain requirements must be met in order to insure that the dog is certified to be competent and properly handled;

12

d.  that the canine and handler should be re-certified annually or as necessary by a qualified and certified K-9 police dog trainer; and

e.  the canine should respond to the obedience commands of its handler as a control feature rather than as a competitive exercise.

70.  A violation of a citizen's federally protected right to be free of unreasonable seizures is a highly predictable consequence of this failure to train the canine officers to handle these recurring situations.

71.  This lack of training left Harlan to his own discretion as how to handle Tyson and how to handle situations as encountered that day and was a proximate cause of his use of excessive force.

72.  Grudek's decisions were with forethought and knowledge that the likelihood that Tyson would unnecessarily and unreasonably injure someone. These decisions were in derogation of Badley's well established rights and privileges protected by the 4th, and 14th amendments to the U.S. Constitution and federal laws.

73.  There was no such training despite the obvious need. The failure was in deliberate indifference to a predictable outcome of a violation by excessive and unreasonable use of force.

74.  As outlined in the preceding paragraphs, the County's policy of using service dogs to apprehend and attack unarmed, non-resisting suspects, such as Badley, violated Badley's right to be free of unreasonable thus excessive force.

75.  Grudek was aware that the canine's natural potential for aggressiveness is heightened by the training it receives and thus continuous re-training is required to reinforce its

13

obedience and responsiveness to its handler.

76.     Despite his awareness of the likelihood Tyson's fitness for duty would deteriorate without ongoing evaluation and monitoring, Grudek made the decision not to monitor Tyson's fitness for duty and its risk of unreasonable harm to citizens and suspects such as Badley. This policy decision was a proximate cause of the deprivation of Badley's constitutional rights.

77.     Despite his awareness of the likelihood Tyson's fitness for duty would deteriorate without particularized on-going training reinforcing his obedience, Grudek chose not to establish regularly scheduled obedience training for Tyson and monitor Harlan's adherence to said schedule. This policy decision was a proximate cause of the deprivation of Badley's constitutional rights.

78.     Grudek's decision not to specifically train on suspect apprehension and arrest established the policy for Harlan and Tyson.

79.     Grudek's decision not to require ongoing and regular obedience training to prevent deterioration of the service dog's responsiveness to its handler established the policy for Harlan and Tyson.

80.     This lack of training left Harlan to his own discretion as how to train Tyson and handle such situations and was a proximate cause of his use of excessive force.

81.     These decisions were in derogation of Badley's well established rights and privileges protected by the 4th, and 14th amendments to the U.S. Constitution and federal laws.

82.     The above recited acts and omissions of Defendants constitute a deprivation of Badley's constitutional entitlement to be free from excessive force as guaranteed by the 4th, and

14

14th Amendments to the United States Constitution.  Such acts of Defendants while acting within the color of their authority are sufficient to invoke an action under 42 U.S.C. § 1983 against them for which Badley seeks damages as set forth herein below.

83.     The County, as a municipality, is not entitled to qualified immunity and is separately liable for its policies, usages, customs, practices, established by Grudek's decisions as the final decision and policy maker for the County which have the force and effect of law.

STATE LAW CLAIMS

84.     Badley adopts by reference the allegations contained in paragraphs 5 through 44 above.

85.     The above described actions were in derogation of Badley's well established rights and privileges protected by the Ark. Const. Art. 2 § 2. 2 § 6, 2 § 9, 2 §*15* redressable under the Arkansas Civil Rights Act of 1993 (ACRA), codified at A.C.A. § 16-123-101 et seq.

86.     This action violated Badley's rights, privileges, and immunities secured by the Arkansas Constitution and laws thereunder.

87.     Badley had a right to be free of unnecessary and needless harmful and offensive contact.

DAMAGES

88.     As a natural and foreseeable result of said acts of Defendants, Badley suffered extreme pain and suffering, past, present and future, severe emotional distress, public humiliation, and permanent scarring and disfigurement. For these acts, injuries and losses Badley seeks damages as set forth below.

15

89.     For the acts, omissions, customs and policies complained of herein, Badley seeks the following relief:

a.      Compensatory and punitive damages for violation of his constitutional rights redressable under 42 U.S.C. § 1983;

b.      Compensatory and punitive damages for violations of his rights protected by the Arkansas Constitution redressable under the ACRA;

c.      Damages for pain and suffering, past, present, and future;

d.      Damages for emotional distress;

e.      Damages for humiliation and public embarrassment;

f.      Damages for permanent scarring and disfigurement;

g.      Reasonable Attorney's fees and costs;

h.      All other damages to which the Plaintiff is entitled under § 1983 and the ACRA, federal, and state laws.

90.     Badley reserves the right to plead further as subsequently discovered evidence warrants.

WHEREFORE, Brennan Badly requests judgments against the Defendants, jointly and severally, for violation of his rights protected by the United States Constitution redressable under 42 U.S.C. § 1983; and, Ark. Const. Art. 2 § 2. 2 § 6, 2 § 9, 2 §*15* redressable under the Arkansas Civil Rights Act of 1993 (ACRA*)*, codified at A.C.A. § 16-123-101 et seq..  Furthermore, the Plaintiff seeks judgment for compensatory damages for the violations of said rights as well as the pain and suffering and mental anguish, and permanent scarring and disfigurement; for punitive

damages; for reasonable attorney's fees and costs; and for all other just and proper relief in the premises.

**PLAINTIFF DEMANDS A JURY TRIAL**

Respectfully submitted for
Brennan Badley, plaintiff herein

Morris W. Thompson

Morris W. Thompson Law Firm, P.A.
P. O. Box 662
Little Rock, AR  72203
(501) 661-8100
(501) 663-3544
E-mail:  mwthompsonlaw@sbcglobal.net
ABN: 80145